**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **J.B., by and through Karen Belton**<br>**as next friend,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs** | ) | **Case number 4:08cv0641 CAS** |
| | ) | **TCM** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael

J. Astrue, the Commissioner of Social Security ("the Commissioner"), denying the

application for supplemental security income benefits ("SSI") under Title XVI of the

Social Security Act, 42 U.S.C. §§ 1381-1383b, filed on behalf of J. B. ("Plaintiff") by his

mother, Karen Belton, is before the undersigned for a review and recommended

disposition. Plaintiff has filed a brief in support of his complaint; the Commissioner has

filed a brief in support of his answer.

**Procedural History**

Ms. Belton applied for SSI on Plaintiff's behalf in June 2005,[1] alleging he was

disabled since the age of six months due to asthma, attention deficit hyperactivity disorder

---

[1]An earlier application was denied in June 2003.

("ADHD"), wheezing, and a seizure disorder. (R.[2] at 43-46.) This application was denied initially and following an administrative hearing in July 2007 before Administrative Law Judge ("ALJ") Thomas C. Muldoon. (Id. at 12-18, 27, 38-42, 391-406.) The Appeals Council denied review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 3-5.)

### Testimony Before the ALJ

Ms. Belton, represented by counsel, was the only witness to testify at the administrative hearing. Plaintiff was present but did not testify.

Ms. Belton testified that her son, Plaintiff, was born on October 30, 1994, and was then twelve years old. (Id. at 394.) Plaintiff lives in a house with her and his sixteen-year old sister. (Id. at 394-95.) He is in the sixth grade. (Id. at 395.) He is in special education classes for a few hours each day. (Id.) The only source of income for the household is the SSI received by Ms. Belton for a seizure disorder. (Id. at 405-06.)

Asked by her attorney what medical problems Plaintiff had that were disabling, Ms. Belton answered that he had asthma and seizures (he stared into space). (Id. at 396.) He was being treated by Dr. Zempel at Children's Hospital for the seizures. (Id.) The two medications he took, Tegretol and Topamax, lessened the frequency of the seizures, but did not eliminate them. (Id. at 397.) Dr. Robert Strunk treated Plaintiff for the asthma. (Id.) Plaintiff had asthma attacks twice a month and had difficulty breathing if he did not take his medication. (Id. at 397-98.) He wheezed regardless of whether he took his

---

[2]Citations to "R" are to the administrative record filed by the Commissioner.

medication.  (Id. at 398, 400-01.)  Plaintiff last needed emergency room treatment for asthma in June.  (Id. at 398.)  He was then given his usual medication and prednisone.  (Id. at 398.)  He also had to go to the emergency room for his asthma in February and May of that year and in October 2006.  (Id.)  Each time he was prescribed prednisone.  (Id.)  In June 2006, he was hospitalized for two days for his asthma.  (Id. at 400.)  He again was prescribed prednisone.  (Id.)  Ms. Belton estimated that Plaintiff had missed approximately 32 days of school the last year due to his asthma.  (Id. at 401.)

Plaintiff was also being treated at the Hopewell Center for ADHD.  (Id.)  He had seen Dr. Kabir once in May and was prescribed Concerta.  (Id. at 401-02.)  The medication had not made a significant change in Plaintiff's behavior.  (Id. at 402.)  Plaintiff did not get along with his teachers and she would have to go to school to calm him down.  (Id.)  This had happened three times the previous year.  (Id.)  And, she talked with him over the telephone six times that year to try to calm him down.  (Id.)

Plaintiff also has a problem holding a pencil; consequently, he does not write well.  (Id. at 403.)

Plaintiff did not belong to any youth groups, nor did he play a team sport.  (Id.)  He was in the Boy Scouts in 2005, but did not get along with the other boys, i.e., he started fights three times.  (Id. at 404.)  He did not "know how to fix his clothes right" and had to have help doing such things as tucking in his shirt.  (Id.)  He knew the safety rules, e.g., he did not get into cars with strangers and did not play with fire.  (Id.)  He had assigned chores at home.  (Id. at 405.)  Some he did okay; some he had to be reminded to do.  (Id.)

## Medical, School, and Other Records Before the ALJ

When applying for SSI for her son, Ms. Belton listed his disabling impairments as asthma, ADHD, a seizure disorder, and wheezing. (Id. at 48.) He was then in the third grade and would have to complete summer school to advance to the fourth grade. (Id. at 54.) In a Daily Activities Report completed when applying for SSI for her son, Ms. Belton disclosed that he attended regular school classes and would be going into the fourth grade. (Id. at 62.) Plaintiff had to use his nebulizer machine twice a night and had to be compliant with his medication to prevent wheezing. (Id.) He could not sit still for longer than three to four minutes. (Id.) He played basketball, but was not on a team. (Id. at 63.) Although he would do his chores, e.g., take out the trash, she would have to check after he was finished to make sure they were done correctly. (Id.) Plaintiff was very respectful to adults. (Id.) The family had just moved to a new neighborhood; Plaintiff had two nine-year old friends in the former neighborhood. (Id. at 64.)

On a separate Function Report form for children ages six to twelve, Ms. Belton reported that Plaintiff did not have any problems seeing, hearing, or talking. (Id. at 66-67.) Although she marked the "Yes" box when asked if his ability to communicate was limited, she also marked that he was able to do each of the itemized tasks, e.g., deliver telephone messages, repeat stories, and tell jokes or riddles accurately. (Id. at 68.) His progress in learning was limited in that he could not read simple words or simple sentences and could not tell time. (Id. at 69.) His physical abilities were limited in that he could not work video game controls or dress action figures. (Id. at 70.) His asthma prevented him from

playing some sports. (Id. at 71.) Ms. Belton also reported that Plaintiff did not have any friends his own age and did not make new friends. (Id.) He needed help with such personal tasks as taking a bath, washing his hair, picking up his toys, obeying safety rules, doing what he was told most of the time, and accepting criticism or correction. (Id. at 72.) He did not need help with such tasks as brushing his teeth or using a zipper. (Id.) His ability to pay attention and stick with a task was also limited. (Id. at 73.)

After the initial denial of her application, Ms. Belton completed a Disability Report – Appeal form in January 2006. (Id. at 75-81.) She reported that Plaintiff's seizures had gotten worse and he was starting to see a psychiatrist. (Id. at 75.) His grades were better, but his teacher said they could still improve. (Id.)

Plaintiff's school records before the ALJ are from the fourth and fifth grades.

Plaintiff's records from the Jennings School District are for the fourth grade and the first two semesters of the fifth grade. In the fourth grade, on the Missouri Assessment Program ("MAP") Plaintiff was considered "Below Basic" in the communication arts and "Proficient" in Mathematics. (Id. at 87.) He had been present 156 days and absent 18 days. (Id. at 86.) It was noted on his mid-year report for the fifth grade that he had been absent six days in the first quarter and twelve in the second. (Id. at 88.) It was also noted at the end of the first quarter that he should try harder, especially when completing assignments, and at the end of the second quarter that he could do better. (Id.) His report card at the end of the first quarter lists "Bs" or "Cs" in reading, mathematics, social studies, science and health, and behavior. (Id. at 89.) He had a "D-" in language arts and

an "F" in spelling.  (Id.)  His strengths included good attendance, contributions to class, displaying a positive attitude, cooperating with the teacher, showing good work effort, and being respectful and courteous.  (Id.)  He needed to improve in the areas of completing class work on time, achieving better test scores, and accurately following directions.  (Id.) At the end of the second quarter, Plaintiff had a "D" or "F" in all subjects.  (Id. at 90.)  The majority of his strengths displayed in the first quarter now needed improvement.  (Id.)

Plaintiff's medical records begin in July 2004, at least nine years after his alleged disability onset date.

Christina Ruby-Ziegler, M.D., with Forest Park Pediatrics, P.C., was Plaintiff's primary care physician.  She first treated him in July 2004, when Plaintiff was three months shy of being ten years old.  (Id. at 107-08.)  His asthma was described as severe and persistent; he had a seizure disorder.  (Id. at 108.)  His medications included Allegra, Albuterol, Advair, Singulair, Tegretol, Uniphyl (theophylline), and Topamax. (Id. at 107.) It was noted that he had been passed from the second to the third grade.  (Id.)  He swam and played basketball; he wanted to play football.  (Id.)  His mother wanted him checked for diabetes.  (Id.)  He was in the 25-50% for height and the 90-95% for weight.  (Id.)  He was to decrease his intake of sugary drinks.  (Id. at 108.)

In September, Plaintiff was treated at Children's Hospital for his asthma.  (Id. at 109.)  Ms. Belton was given instructions on what to do if Plaintiff had an asthma attack. (Id.)

That same month, Plaintiff consulted Robert C. Strunk, M.D., and underwent a pulmonary function study.  (Id. at 127.)  Before treatment, he had a FVC [forced vital capacity] of 1.51 liters, 80% of predicted, and an FEV1[3] of 1.00, 61% of predicted.  (Id.)  After treatment, he had a FVC of 1.50, or 79% of predicted, and a FEV1 of 1.35, or 83% of predicted.[4]  (Id.)  Dr. Strunk noted that Plaintiff had not had any emergency room visits or hospitalizations since the previous June.[5]  (Id. at 126.)  He had, however, had two exacerbations of wheezing, one a few days after his last visit and the other a few days before this visit.  (Id.)  Although Ms. Belton knew the action plan, she did not have the oral steroids to give him.  (Id.)  Dr. Strunk also noted that Plaintiff needed to pretreat before exercising.  (Id.)  Ms. Belton reported that he had not been waking up at night. (Id.)  When the pharmacy was called with Plaintiff's prescriptions, it was reported that he had had "little or no medicine refills over the past month."  (Id.)  Advair had last been filled in January, Uniphyl in June, and Singulair in April.  (Id.)  Albuterol was filled monthly.  (Id.)  Plastic zippered covers were not on Plaintiff's bed; he slept on the carpet. (Id. at 126, 128A.)  Dr. Strunk noted that Ms. Belton had known Plaintiff was sick for the past four days and yet waited until coming to the clinic to start the action plan.  (Id. at 128A.)  He also noted that the lack of refills of Plaintiff's medications was discovered after

_____

[3]"The FEV1 is the volume of air forcefully expired during the first second after a full breath and normally accounts for ™75% of the VC [vital capacity]."  The Merck Manual, 611 (16th ed. 1992).

[4]Improvement in the FEV1 of at least 15% after inhalation of a bronchodilator aerosol "is usually considered a significant response."  Id. at 612,

[5]Records of that visit are not included in the administrative record.

she had left his office; he planned on speaking with her about this.  (Id.)  Perhaps if Plaintiff took medication regularly, he could take less than the currently prescribed dosages.  (Id.)

On the day of Plaintiff's tenth birthday, Ms. Belton called the Children's Hospital asthma answer line when Plaintiff began that evening to have an asthma attack.  (Id. at 111-12.)  He had been symptomatic all day.  (Id. at 111.)  Pollen was listed as the trigger. (Id.)  He had a peak flow meter,[6] but had not used it that day.  (Id.)  Ms. Belton had prednisone at home, and was instructed to give it to Plaintiff every morning for the next four days and to continue with the Albuterol nebulizer.  (Id. at 112.)  One hour after the initial call, Plaintiff had improved.  (Id.)  Two days later, the nurse practitioner in Dr. Ruby-Ziegler's office called Ms. Belton to see how Plaintiff was doing.  (Id. at 110.)  She reported that he was doing better and going to school.  (Id.)  His coughing had improved; he had no wheezing or fever.  (Id.)  She was reminded that Plaintiff was to continue with his medications as directed.  (Id.)

The nurse practitioner spoke with the school nurse at Plaintiff's school on November 19 about Plaintiff's difficulty focusing and disruptive behavior.  (Id. at 113.) He was constantly hungry and would jump up in class.  (Id.)  She also spoke with Ms. Belton, who explained that Plaintiff's behavior was not caused by a change in school; he

---

[6]A peak flow meter is used to measure lung capacity.  Proventil-HFA, Asthma Glossary, http://www.proventilhfa.com/phfa/application?namespace=main&origin=all_nav_left.jsp&event =content_display&event_input=asthma_glossary (last visited Sept. 1, 2009).  "[M]ost physicians recommend use in order to track peak flow measurements on a daily basis . . . ."  Id.

had been exhibiting that behavior for some time.  (Id.)  Plaintiff was to be referred for a mental health evaluation.  (Id.)

On February 15, 2005, Plaintiff went to the Children's Hospital emergency room for complaints of persistent vomiting and a high fever.  (Id. at 128-32.)  He was discharged home after he was able to hold down fluids and Tylenol.  (Id. at 129A.)

Plaintiff underwent a pulmonary function study on March 31.  (Id. at 126A,[7] 142, 145.)  Before treatment, he had a FVC of 1.61 liters, 50% of predicted, and an FEV1 of 1.00, 67% of predicted.  (Id.)  After treatment, he had a FVC of 1.85, or 92% of predicted, and a FEV1 of 1.55, or 89% of predicted.  (Id.)  Dr. Strunk reported that Ms. Belton had told him Plaintiff's asthma symptoms woke him from sleep five to nine times a month and prevented him from doing something he wanted to at least once a week.  (Id. at 142.)  He played basketball and missed a minimal amount of school because of his asthma.  (Id.)  He missed his medications one or two days a week, causing him to wheeze a lot.  (Id.)  The plastic covers for his bedding were torn and had been removed.  (Id.)  Dr. Strunk described this as relevant because Plaintiff was allergic to both species of dust mite.  (Id.)  Dr. Strunk further noted that Plaintiff's "[p]ulmonary functions showed moderate to severe obstruction with excellent response bronchodilator."  (Id. at 126A.)  Dr. Strunk's impression was of "[a]sthma, severe persistent, with poor control on significant medications."  (Id.)  His plan was to work with Plaintiff and his mother on Plaintiff's need to lose weight; Plaintiff's evolving obesity might have a negative impact on his asthma.

---

[7]Page 126A is the second page of a letter that is at page 142 of the record.

(Id.)  The plastic zipper covers needed to be reapplied; a foundation would help with this.
(Id.)  Plaintiff was to return in June.  (Id.)

On May 8, Ms. Belton called the Children's Hospital asthma answer line when Plaintiff had had a non-stop cough after playing ball outside.  (Id. at 115.)  The peak flow meter had not been used; it was "not handy."  (Id.)  There was not enough prednisone on hand for a dose.  (Id.)  Plaintiff started to gag when she tried to give him six puffs of his inhaler.  (Id.)  She was instructed to take him to the emergency room, which she did.  (Id. at 115, 133-41.)  On discharge, he was to take ibuprofen as needed and follow-up with Dr. Ruby-Ziegler if his symptoms had not improved in two days.  (Id. at 141.)  He could return to school the next day.  (Id.)

On May 11, Ms. Belton called the asthma answer line again.  (Id. at 116-17.)  Plaintiff had been playing a lot in the grass and had started to cough.  (Id. at 116.)  Ms. Belton questioned whether she could give him cough syrup; she was not to.  (Id. at 116-17.)  She had given him aspirin; she should not.  (Id.)  The nurse advised her to give Plaintiff two Albuterol treatments.  (Id. at 117.)  She did, and one hour later Plaintiff was better and had only occasional coughing.  (Id. at 118.)  Ms. Belton was told to give Plaintiff an Albuterol treatment every four hours for the next twenty-four hours.  (Id.)

Dr. Ruby-Ziegler saw Plaintiff the next day.  (Id. at 119-20.)  Ms. Belton asked about ADHD.  (Id. at 119.)

In June, Plaintiff underwent another pulmonary function test.  His FVC before treatment was 1.86 liters, or 92% of predicted, and his FEV1 was 1.35, or 76% of

predicted.  (Id. at 144.)  After treatment, his FVC was 2.06, or 102% of predicted, and his FEV1 was 1.70, or 98% of predicted.  (Id.)  Dr. Strunk noted that Plaintiff and his grandmother reported that he had been bothered "very little over the past month" by this asthma.  (Id. at 127A.)  There was a concern that his medications may be contributing to his hyperactive symptoms; he was being evaluated for ADHD.  (Id.)  Dr. Strunk also noted that the pulmonary function testing had "showed moderate obstruction with excellent response to bronchodilator."  (Id.)  Plaintiff was to continue with his current medication regimen (Advair, one inhalation twice a day; Singulair, five milligrams a day; Uniphyl, 40 milligrams, at bedtime; Allegra, thirty milligrams twice a day; Nasonex, one to two sprays each day; and Albuterol, as needed) and was encouraged to decrease his television watching and increase his physical activity.  (Id. at 127A, 143.)

The following week, Plaintiff was seen by Rosemary Jackson, a clinical social worker at Provident Counseling, and was diagnosed with ADHD.  (Id. at 152.)  He had been experiencing an "[i]nability to stay organize and on task, did not follow instructions," did not complete some school work, lost items important for school work or task, "was inattentive, fidgeted, squirmed and was impulsive."  (Id.)

On September 9, Plaintiff was seen by John Zempel, M.D., Ph.D., for an initial neurological evaluation.  (Id. at 184-85.)  Dr. Zempel noted that Plaintiff had not seen anyone for his seizures since April 2004.[8]  (Id. at 184.)  He did not know how Plaintiff was getting his medications, if he had been taking them.  (Id.)  Dr. Zempel also noted that Ms.

_____

[8]These records also are not included in the administrative record.

- 11 -

Belton had not brought Plaintiff for laboratory work after his last visit so the medication levels were unclear. (Id.) He was concerned that she had been giving him her own medication, Tegretol and Topamax. (Id.) A call to the pharmacy confirmed that Plaintiff had not received any recent prescriptions. (Id.) Ms. Belton described a seizure Plaintiff had two weeks before the visit as staring off in space and standing still for three to four minutes. (Id.) He was doing this "many" times a month. (Id.) After examination, Dr. Zempel assessed Plaintiff as having a history of seizures with unclear medications and uncertain compliance. (Id.) His past medications were renewed. (Id. at 185.) He did not go to the laboratory after the visit to have his medication levels tested. (Id.) He did go two weeks later. (Id. at 198-200.)

In November, Ms. Belton and Plaintiff participated in an intake assessment interview at the Hopewell Center as preparation for Plaintiff undergoing a psychiatric evaluation by Dr. Oruwari in one week. (Id. at 186, 188-97.) Ms. Belton reported that Plaintiff was not focused, required time and supervision to get something done, had an attitude problem, and did not get along with her live-in fiancé. (Id. at 190.) His problems were first noticed when he was in the third grade; he was now in the fourth grade. (Id.) He liked to play basketball and football with friends. (Id. at 192.) He was helpful to other people. (Id.) During the interview, his thoughts were clear, coherent, well-organized, and relevant. (Id. at 193.) He was oriented to person, place, and time. (Id. at 194.) He did not know why he was at the Hopewell Center, but generally showed good insight. (Id.)

Plaintiff did not keep his appointment with the psychiatrist. (<u>Id.</u> at 186.)

On January 26, 2006, Plaintiff had a pulmonary function test and saw Dr. Strunk. (<u>Id.</u> at 201-04.) Plaintiff had had no emergency room visit since Dr. Stunk had last seen him. (<u>Id.</u> at 202.) He was, however, currently suffering from an asthma exacerbation that had begun one week earlier and was taking Albuterol four times a day. (<u>Id.</u>) Plaintiff had self-discontinued the theophylline (Uniphyl) that he had been started on at the last visit for his early morning cough. (<u>Id.</u>) His mother had stopped it because his teachers reported that Plaintiff was drowsy and falling asleep at school. (<u>Id.</u> at 203.) He no longer did so after the theophylline was stopped. (<u>Id.</u>) Although his pillow was now encased, his mattress was not. (<u>Id.</u> at 202.) His pulmonary function test was within normal confidence intervals for Plaintiff's height and gender. (<u>Id.</u> at 203.) Because Plaintiff had used a bronchodilator that morning, he could not be tested post-bronchodilator. (<u>Id.</u>) Dr. Strunk was pleased that Plaintiff had not required any oral steroids, but noted that he was having daily symptoms and was on "almost maximal preventive medications." (<u>Id.</u>) His dosage of theophylline was to be halved in the hopes of relieving his early morning cough. (<u>Id.</u>)

In February, Plaintiff did undergo a psychiatric evaluation by Patrick Oruwari, M.D., at the Hopewell Center. (<u>Id.</u> at 205-06.) Ms. Belton and Plaintiff's stepfather reported that Plaintiff was "forgetful of everything" at home, had difficulty focusing, did not finish his schoolwork, and argued a lot. (<u>Id.</u> at 205.) He did not get along with his stepfather. (<u>Id.</u>) On examination, he was very distracted but pleasant; oriented to time,

person, and place; had good impulse control but poor concentration; had no obsessions or compulsions; and was of below average intelligence. (Id. at 206.) He was diagnosed with ADHD, predominantly inattentive type and learning disorder, mostly reading and writing. (Id.) His current Global Assessment of Functioning[9] ("GAF") score was 53.[10] (Id.) A trial of Concerta was begun; Plaintiff was to return in four weeks. (Id.)

In April, Plaintiff again saw Dr. Strunk and had another pulmonary function study. (Id. at 207-09.) Dr. Strunk reported that Ms. Belton had started Plaintiff on oral steroids two weeks before without consultation. (Id. at 208.) She reported that Plaintiff had been having asthma symptoms three to six times a week and woke up approximately three times each week at night. (Id.) His only allergy was to both species of dust mite. (Id.) On examination, he was described as "his usual busy but engaging self." (Id.) The pulmonary function test showed mild obstruction. (Id. at 209.) His current medications were continued. (Id.)

A pulmonary function study on July 18 resulted in a FVC before treatment of 2.14 liters, 97% of predicted, and an FEV1 of 1.61, 85% of predicted. (Id. at 238.) After treatment, he had a FVC of 2.20, or 100% of predicted, and a FEV1 of 1.75, or 93% of

---

[9]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000), the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003); accord **Juszczyk v. Astrue**, 542 F.3d 626, 628 n.2 (8th Cir. 2008).

[10]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Diagnostic Manual at 34 (alteration added).

predicted. (Id.) Ms. Belton reported to Dr. Strunk that Plaintiff was continuing to have shortness of breath six times a week and was having more exertional symptoms. (Id. at 247.) Plaintiff reported that he was doing fine. (Id.) He had had no prednisone, emergency room visits, or hospitalizations. (Id.) He did notice that his symptoms were worse if he missed his theophylline. (Id.) The pulmonary function tests reflected improvement from April. (Id. at 247-48.) His dosage of Uniphyl was to be increased and he was prescribed an antibiotic to clear up a possible sinus infection. (Id. at 248.)

On September 3, Plaintiff went to the emergency room at Children's Hospital with a rash and a two-day history of a sore throat. (Id. at 249-56.) A culture was taken; he was prescribed antibiotics and released. (Id.)

Plaintiff had a pulmonary function study in October. (Id. at 237.) His FVC before treatment was 2.32 liters, 104% of predicted, and his FEV1 was 1.82 liters, 94% of predicted. (Id. at 237.) These results were in the normal range; indeed, his FEV1 was the best ever. (Id. at 245.) Plaintiff's asthma was described as being well controlled with currently no asthma symptoms, only one prednisone course, and no emergency visits. (Id.) He was taking his medications. (Id.) It was unclear why his asthma had improved; the only change to his medications had been an increased dosage of Uniphyl. (Id.)

On November 13, Plaintiff was seen again by Dr. Zempel in the pediatric epilepsy office at Children's Hospital. (Id. at 243-44.) Dr. Zempel noted that he had last seen Plaintiff one year before and was unclear about how Plaintiff had been getting his medications. (Id. at 243.) Plaintiff's teacher had not noticed any ongoing seizures; his

mother reported that he was having one spell per week. (Id.) He also noted that Ms. Belton had not scheduled Plaintiff for the six-month follow-up appointment as directed. (Id. at 244.) He wanted to admit Plaintiff for one to two days of video electroencephalographic ("EEG") monitoring to clarify if he was having frequent ongoing seizures and to have laboratory tests done to get Plaintiff's medications adjusted. (Id.)

The next day, Plaintiff was admitted to Children's Hospital from the emergency room after wheezing all morning and then starting to vomit. (Id. at 227-32, 257-91.) He also had had strep throat and a fever. (Id. at 278.) The following day, November 15, he had a seizure that lasted three to four minutes followed by one minute of confusion. (Id. at 282.) A notation dated the next day reads that he had probably had a seizure during the night lasting two minutes; he seemed disoriented. (Id. at 280, 282.) A video EEG was to be arranged. (Id.) He was discharged that same day. (Id. at 257, 280.)

A pulmonary function study on November 21 resulted in a FVC before any treatment of 2.29 liters, 101% of predicted, and an FEV1 of 1.63, 83% of predicted. (Id. at 236.) Seen in the allergy clinic that same day, Plaintiff reported that he had continued to have daily wheezing several times a day since his discharge, nocturnal symptoms on a daily basis, with a cough, and a runny nose. (Id. at 241.) He had had a fever two days before. (Id.) Dr. Strunk opined that Plaintiff's symptoms were likely due to a "not completely treated infection." (Id. at 242.) He was started on an antibiotic and was to return in two weeks to be reevaluated after his infection had cleared. (Id.)

A pulmonary function study on December 11 resulted in a FVC before treatment of 2.00 liters, 88% of predicted, and an FEV1 of 1.43, 73% of predicted. (Id. at 235.) After treatment, he had a FVC of 2.19, or 96% of predicted, and a FEV1 of 1.65, or 84% of predicted. (Id.) Plaintiff reported that he was 100% compliant with his medications. (Id. at 239.) Since his previous visit, in October, his asthma was uncontrolled and he had required hospitalization three times. (Id.) He had begun taking prednisone for a cough three days before. (Id.) The dosage was decreasing; the cough was not resolving. (Id.) The pulmonary function test had shown mild obstruction with significant bronchodilator response. (Id. at 240.) His medications were continued, and the prednisone course was extended. (Id.)

On January 3, 2007, Plaintiff was admitted to Children's Hospital after having a seizure. (Id. at 221-26, 292-309, 319-21, 358-90.) His medications were 200 milligrams of Tegretol twice a day and 100 milligrams of Topamax twice a day. (Id. at 300.) He was reported to have a history of complex partial epilepsy and "likely non compliance." (Id.) Ms. Belton reported that Plaintiff was "very compliant" with his medications. (Id. at 301.) The next day, it was reported that Plaintiff had had no seizure activity during the night. (Id. at 304.) The nurse reported that Plaintiff had been awake until midnight. (Id.) He was discharged on January 4. (Id. at 292.)

Five days later, Plaintiff had a video EEG exam that was monitored for 25 hours. (Id. at 233-34, 329-30.) His seizures were reported to consist of mumbling, finger

twiddling, and staring for two to four minutes.  (Id. at 233, 329.)  They occurred once or twice a month.  (Id.)  He was, however, asymptomatic during the EEG.  (Id. at 234, 330.)

On March 1, Plaintiff went to the Children's Hospital emergency room after flipping over the handlebars of his bicycle and landing on his right wrist three days before, doing the same thing two days before, and then, one day before, striking his wrist against a pole.  (Id. at 326-27, 340-53.)  X-rays revealed a fracture of the distal right radial metadiaphysis.  (Id. at 327.)  The wrist was set; later x-rays showed the fracture had healed.  (Id. at 322-25.)

Plaintiff returned to Dr. Strunk on March 20.  (Id. at 328, 356-57.)  Dr. Strunk noted that Plaintiff's asthma seemed to have improved since he had last seen him, but continued to be symptomatic primarily with exercise and had required a prednisone course in January.  (Id. at 356.)  Ms. Belton reported that Plaintiff had asthma symptoms two or fewer times a week irrespective of exercising and awoke almost every night with wheezing.  (Id.)  A pulmonary function test revealed values that were "their best ever in percent predicted terms and his best ever in absolute terms.  FEV1 was 1.85 liters of 93% predicted."  (Id.)  A bronchodilator challenge was not performed.  (Id.)  Plaintiff did have a mild obstruction.  (Id.)  Dr. Strunk's impression was of severe, persistent asthma.  (Id.)  His control was better, although he continued to wake up regularly at night.  (Id.)  He was taking the Uniphyl regularly.  (Id.)  He was continued on his current medications and was to return in three months.  (Id.)

Plaintiff returned to the Children's Hospital emergency room on April 24 after two days of coughing, wheezing, and experiencing chest tightness.  (Id. at 333-37.)  The chest tightness had begun while he was riding his bicycle.  (Id. at 335.)  He was treated with Albuterol and Atrovent and was discharged with instructions to take the remaining three days of a five-day course of prednisone that he had already begun and to continue with the Albuterol every four hours for the next twenty-four hours and then as needed.  (Id. at 336, 337.)

Plaintiff again saw Dr. Zempel on May 14.  (Id. at 316-18, 354-55.)  Dr. Zempel noted that the 25-hour EEG had showed "[n]o subclinical, barely clinical or clinical seizures."  (Id. at 354.)  Ms. Belton reported that Plaintiff continued to have seizures, which consisted of staring spells.  (Id.)  The last had been two weeks ago.  (Id.)  Dr. Zempel opined that Plaintiff might have complex partial seizures.  (Id.)  Laboratory studies indicated subtherapeutic levels of carbamazepine (Tegretol) and topiramate (Topamax).  (Id. at 355.)  The latter puzzled Dr. Zempel because he did not know how Plaintiff got started on topiramate, which his mother also took.  (Id. at 354, 355.)  He wanted Plaintiff to have the levels tested again in two weeks.  (Id. at 355.)

The ALJ also had before him several evaluations of Plaintiff performed as a consequence of his SSI application.

Grace Peimann, a teacher at Woodland Elementary, completed a Teacher Questionnaire for Plaintiff in September 2005, cautioning that she had only known Plaintiff for two weeks.  (Id. at 155-62.)  Of ten activities in the domain of acquiring and

using information, he had a "very serious problem" in two: "[r]eading and comprehending written material" and "[e]xpressing ideas in written form." (Id. at 161.) He did not have a serious problem in any activity. (Id.) He had an obvious problem in four activities: "[c]omprehending and/or following oral instructions," "[u]nderstanding school and content vocabulary," "[r]ecalling and applying previously learned material," and "[a]pplying problem-solving skills in class discussions." (Id.) He had a "slight problem" in the remaining five activities. (Id.) In the domain of attending and completing tasks, Plaintiff had a serious problem in one: "[c]arrying out multi-step instructions." (Id. at 160.) He had an "obvious problem" in five activities, including "[p]aying attention when spoken to directly," "[f]ocusing long enough to finish assigned activity or task," "[r]efocusing to task when necessary," "[c]arrying out single-step instructions," and "[w]orking without distracting self or others." (Id. at 160.) He had either a slight problem or no problem in the remaining seven activities. (Id.) In the domain of interacting and relating with others, Plaintiff had a slight problem or no problem in all thirteen activities. (Id. at 159.) It had not been necessary to use any behavior modification strategies with him. (Id.) Plaintiff had no problem in the domains of moving about and manipulating objects and of caring for himself. (Id. at 157-58.)

In October 2005, pursuant to the SSI application, Plaintiff was evaluated by L. Lynn Mades, Ph.D., a licensed psychologist. (Id. at 165-73.) Plaintiff "generally denied problems," reporting that his grades were "Cs" and above and that he got along well with peers and teachers. (Id. at 165.) Ms. Belton reported problems "such as arguing with his

sister, not staying in his seat at school, [and] not doing things as soon as he is asked." (Id. at 166.) She had to check up on him to make sure he followed through on tasks. (Id.) She started to notice problems with his behavior two or three years before. (Id.) His medical history was significant for seizure disorder and asthma. (Id.) Plaintiff was in the fourth grade and was not receiving any special education services. (Id.) On examination, Plaintiff was alert, oriented appropriately to his age, and had a memory within normal limits. (Id. at 168.) On testing, his frustration tolerance appeared to be fair to good, his persistence with tasks was good. (Id.) His overall effort and motivation appeared to be good. (Id.) On the Wechsler Intelligence Scale for Children – Fourth Edition ("WISC-IV"), he had a verbal comprehension index of 87, a perceptual reasoning index intelligence quotient ("IQ") of 88, a processing speed index of 91, and a full sale IQ of 88. (Id. at 168.) These scores placed him in the low average range of cognitive functioning overall. (Id.) He had no restrictions in his daily activities. (Id. at 169.) Dr. Mades noted that during the examination, Plaintiff had only a couple of behaviors that were consistent with ADHD, i.e., slightly rapid speech at times and making noises while working on tasks, but further noted that this might have been due to the one-on-one nature of the evaluation. (Id. at 169-70.) She assessed his GAF score as 75-80.[11] (Id. at 169.)

That same month, citing Plaintiff's medical records and Dr. Mades' report, Despine Coulis, M.D., and Judith A. McGee, Ph.D., completed a Childhood Disability Evaluation

---

[11]A GAF between 71 and 80 is described as "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors . . . ; no more than slight impairment in social, occupational, or school functioning . . . ." Diagnostic Manual at 34.

Form.  (Id. at 174-80.)  Plaintiff's impairments were listed as asthma, ADHD, and a history of seizure disorder.  (Id. at 174.)  These impairments were severe, but did not meet or medically or functionally equal an impairment of listing-level severity.  (Id.)  Specifically, the impairments resulted in a less than marked limitation of Plaintiff's ability to acquire and use information and to attend and complete tasks.  (Id. at 176.)  They resulted in no limitation in his ability to interact and relate with others, to move about and manipulate objects, and to care for himself.  (Id. at 176-77.)  They resulted in a marked limitation in his health and physical well-being based primarily on his asthma.  (Id. at 177, 179.)

## The ALJ's Decision

After noting that there was no evidence that Plaintiff, then thirteen-years old, was engaged in substantial gainful activity, the ALJ summarized Ms. Belton's testimony and Plaintiff's medical and school records and then concluded that the medical evidence did not establish any impairment or combination of impairments that met or medically or functionally equaled an impairment of listing level severity.  (Id. at 13-16.)  Plaintiff's breathing problems did not satisfy the criteria of Section 103.02 for obstructive lung disease or of Section 103.03 for disabling asthma.  (Id. at 16.)  His staring episodes, which might *not* be attributable to a neurological seizure disorder, were controllable by medication.  (Id.)  He had "no worse than low average intelligence."  (Id.)  "There [was] no clear evidence of any learning disorder, or at least one that was diagnosed at [Plaintiff's] school."  (Id.)  His poor grades were attributed to his poor effort.  (Id.)  There was also no documented medical or school evidence that he had frequent disciplinary

problems at school. (Id.) Although Plaintiff had been diagnosed with ADHD, there was no documented record of any follow-up or long term psychiatric or other medical treatment for this impairment, suggesting that this alleged mental impairment was not of a very serious or uncontrollable degree. (Id.) There was no indication of any severe, uncontrollable adverse side effects from medications. (Id.)

The ALJ then concluded that the "medical records by Dr. Strunk and Dr. Zempel and the school records [are] much more credible than the statements of Ms. Jackson and Dr. Oruwari, both of whom saw [Plaintiff] only one time each, and the self-serving statements by [Plaintiff's] mother . . . ." (Id. at 17.) He further concluded that Plaintiff had, at worst, a less than marked limitation in attending to and completing tasks and in health and physical well being ("because of a tendency towards asthma exacerbations"). (Id.) He had no limitations in interacting and relating with others, in moving about and manipulating objects, and in caring for himself. (Id.) Moreover, even if he had a marked limitation in health and physical well being, as suggested by the State agency medical evaluators, he had no marked limitation in any other domain of functioning and no extreme limitation in any domain. (Id.)

Plaintiff was not, therefore, disabled within the meaning of the Act. (Id.)

## Legal Standards

Title 42 U.S.C. § 1382c(a)(3)(C)(i) provides that "[a]n individual under the age of 18 shall be considered to be disabled for purposes of [SSI] if that individual has a medically determinable physical or mental impairment, which results in marked and severe

functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  To decide whether a child satisfies this criteria, an ALJ employs a three-step sequential process. "First, the ALJ determines if the child is engaged in substantial gainful activity." **Scott ex rel. Scott v. Astrue**, 529 F.3d 818, 821 (8th Cir. 2008) (citing 20 C.F.R. § 416.924(b)). Second, if the child is not working, as J.B. is not, the ALJ "determines if the child has 'a medically determinable impairment(s) that is severe.'" **Id.** (quoting § 416.924(c)).  "And, third, if the child's impairment is severe, the ALJ must then determine whether the impairment or combination of impairments meets or medically equals the severity of a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1." **Id.** (citing § 416.924(d)). Accord **Garrett ex rel. Moore v. Barnhart**, 366 F.3d 643, 647 (8th Cir. 2004); **Bryant v. Apfel**, 141 F.3d 1249, 1251 (8th Cir. 1998).  "An impairment is functionally equivalent to a listing when the impairment results in an 'extreme' limitation in one domain of functioning or a 'marked' limitation in two domains of functioning." **England v. Astrue**, 490 F.3d 1017, 1020 (8th Cir. 2007) (citing 20 C.F.R. § 416.926a(a)).  "A marked limitation in a domain is a limitation that seriously interferes with a child's ability to 'independently initiate, sustain, or complete activities.'" **Id.** (quoting § 416.926a(e)(2)(i)). Such limitation is "'more than moderate' but 'less than extreme.'" **Id.** (quoting § 416.926a(e)(2)(i)).  An "extreme limitation" is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." § 416.926a(e)(3)(i)).  The six domains are (1) acquiring and using information, (2)

- 24 -

attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. § 416.926a(b)(1).

The Commissioner's decision denying a child SSI benefits is reviewed by this Court to determine whether it is supported by substantial evidence. **Scott**, 529 F.3d at 821; **England**, 490 F.3d at 1019. "'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's decision.'" **Id.** (quoting Stormo v. Barnhart, 377 F.3d 801, 805 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must also take into account whatever in the record fairly detracts from that decision. **Scott**, 529 F.3d at 821; **England**, 490 F.3d at 1019; **Garrett**, 366 F.3d at 646. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion. **England**, 490 F.3d at 1019; **Pyland v. Apfel**, 149 F.3d 873, 876 (8th Cir. 1998).

## Discussion

Plaintiff argues that the Commissioner's adverse decision is not supported by substantial evidence on the record as a whole because the ALJ (1) failed to properly consider (a) the criteria for Listing 103.03 for disabling asthma, particularly the evidence of his persistent wheezing, of his need for night-time medication, and the use of steroid bursts, and (b) the criteria for Listing 111.03 for a seizure disorder, and (2) failed to

properly consider his functional limitations in the domains of attending to and completing tasks and of health and physical well-being. The Commissioner disagrees.

Listings 103.03 and 111.03. Listing 103.03C[12] defines disabling asthma as follows.

C. Persistent low-grade wheezing between acute attacks or absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators with one of the following:

1. Persistent prolonged expiration with radiographic or other appropriate imaging techniques evidence of pulmonary hyper-inflation or peribronchial disease; or

2. Short course of corticosteroids[13] that average more than 5 days per month for at least 3 months during a 12-month period . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1.

"Persistent" is "[c]ontinuous, continuing to exist; enduring; lasting; chronic." Oxford English Dictionary, http://dictionary.oed.com/cgi/entry/50176204?single=1&query_type=word&queryword=persistent (last visited Sept. 1, 2009.) Plaintiff's medical records reflect sporadic, not persistent, wheezing. The first included record of treatment for Plaintiff's asthma was in September 2004. It was noted that he had been wheezing, but his mother had not given him the recommended medication, had not refilled the previously-prescribed medication, and had not put the recommended plastic covers on his bedding.

_____

[12]Listing 103.03A defines disabling asthma in terms of FEV1 readings; Listing 103.03B defines it in terms of the severity of asthma attacks and the need for physician intervention. 20 C.F.R. Pt. 404, Subpt. P. App. 1. Plaintiff does not contend that his asthma satisfies these two Listings.

[13]Prednisone is a corticosteroid. Drugs.com, http://www.drugs.com/search.php?searchterm=prednisone (last visited Sept. 1, 2009).

Plaintiff had an asthma attack, with no wheezing, the next month; it improved within one hour. In March 2005, his mother said Plaintiff wheezed when he missed his medication; there were still no plastic coverings on his bedding. She placed a call in May to the asthma answer line; there was improvement within the hour. In June, Plaintiff and his grandmother reported that his asthma bothered him very little. In January 2006, Dr. Strunk noted the lack of an emergency room visit for many months. In April and October, Plaintiff's asthma was described by his mother and by Dr. Strunk, respectively, in encouraging terms and without reference to wheezing. In November, Plaintiff went to the emergency room with complaints of daily wheezing. The next month, he reported that his asthma was worse. Three months later, however, his asthma was noted to have improved. The foregoing summary illustrates the absence of any "persistent wheezing." Sometimes Plaintiff experienced an asthma attack without wheezing; sometimes his wheezing was attributable to missed medication[14]; and sometimes a report of wheezing of several days' duration is followed by a report of improvement. During no period of any duration was Plaintiff's wheezing "persistent." Cf. **Williams ex rel. Torres v. Barnhart**, 314 F.Supp.2d 269, 273 (S.D. N.Y. 2004) (child whose medical records included seventeen references in medical records to wheezing during seventeen- month period, including one reference to coughing and wheezing for week and another reference to coughing four nights a week with "a lot of wheezing," and whose mother testified that she gave him bronchodilators

---

[14]"In order to get benefits," a child must follow prescribed treatment if the treatment can reduce his or her functional limitations so that they are no longer marked and severe. 20 C.F.R. § 416.930(a).

several times each day and again in the middle of the night three to four times a week met "persistent wheezing" criterion).

Additionally, as noted by the Commissioner, "[t]o meet a listing, an impairment must meet all of the listing's specified criteria." **Johnson v. Barnhart**, 390 F.3d 1067, 1070 (8th Cir. 2006) (citing Sullivan v. Zebley, 493 U.S. 521, 530 (1990)). In addition to persistent wheezing, a claimant must require a short course of corticosteroids averaging more than five days per month for at least three months during a twelve-month period to satisfy Listing 103.03C.[15] Plaintiff did not.[16]

Plaintiff also argues that he satisfies Listing 111.03 for nonconvulsive epilepsy: "In a child with an established seizure disorder, the occurrence of more than one minor motor seizure per week, with alteration of awareness or loss of consciousness, despite three months of prescribed treatment." This argument is unavailing for two reasons. First, after Plaintiff underwent the 25-hour EEG, Dr. Zempel questioned whether he had a seizure disorder. Second, the record does not reflect three months of prescribed treatment. Rather, it reflects that Ms. Belton failed to follow the prescribed treatment, disregarding Dr. Zempel's requests that laboratory tests be done to ascertain medication levels in Plaintiff, not filling the medications that were prescribed, and apparently giving Plaintiff her own medication.

---

[15]Plaintiff does not allege that he met the other additional requirement.

[16]The Court does not include the course of prednisone that Ms. Belton started Plaintiff on in April 2005 without consulting with Dr. Strunk. Even included, however, Plaintiff fails to satisfy this criteria.

Functional Limitations.  Citing the reports of his teachers, Ms. Jackson, and Dr. Oruwari, Plaintiff next argues that the evidence establishes that he has a marked limitation in the domains of attending to and completing tasks and of health and physical well being. Citing the school records, Dr. Mades' report, and the records of Drs. Strunk and Dr. Zempel, the ALJ found that Plaintiff had a less than marked limitation in these two domains.

The domain of attending and completing tasks requires a consideration of "how well [the child is] able to focus and maintain [his] attention, and how well [he] begin[s], carr[ies] through, and finish[es] [his] activities, including the pace at which [he] perform[s] activities and the ease with which [he] change[s] them."  20 C.F.R. § 416.926a(h). Attention "involves the ability to filter out distractions and to remain focused on an activity or task at a consistent level of performance."  20 C.F.R. § 416.926a(h)(1)(i).

Social Security Ruling 06-03p considers teachers and other educational personnel as "non-medical sources" who may have close contact with claimants and who may be "valuable sources of evidence for assessing impairment severity and functioning."  Social Security Ruling 06-03p, 2006 WL 2329939, *3 (S.S.A. 2006).  Such sources often "have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time."  Id.  The Ruling further provides that:

> For opinions from sources such as teachers, counselors, and social workers . . . and other non-medical professionals, it would be appropriate to consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty

or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion.

Id. at *5. Ms. Jackson is a clinical social worker. Her brief letter to the ALJ refers to one previous counseling session; however, the record itself of that session is not in the administrative record. Moreover, it is clear from a reading of that letter that much of what is included was not based on her personal observations but on those of an unidentified source. On the other hand, the intake interviewer at Hopewell characterized Plaintiff's thoughts as clear, coherent, well-organized, and relevant. Other than the Teacher Questionnaire completed by a teacher who had known Plaintiff for only two weeks, his only comprehensive school report was from the fifth grade and was not probative of Plaintiff's ability to function in the domain of attending to and completing tasks. His grades the first quarter were generally good; his strengths were many. The second quarter, it was the reverse. Dr. Oruwari saw Plaintiff, his mother, and his stepfather one time. The history-section of his two-page report summarizes Plaintiff's mother's and stepfather's description of his behavior; portions of the transcription are missing. Although the report does not reflect any testing, Dr. Oruwari describes Plaintiff's intelligence as below average. He assessed Plaintiff's GAF as reflecting moderate symptoms. Dr. Mades, on the other hand, clearly interviewed both Plaintiff and his mother. She described Plaintiff's persistence with tasks as good. See **England**, 490 F.3d at 1022 (affirming ALJ's decision that child who reportedly had "only 'some difficulty'" in staying on track during interview had less than a marked limitation in domain of attending and completing tasks). She noted

that Plaintiff was not receiving any special education services, see **id.** (child with less than marked limitation in attending and completing tasks domain had never had to repeat grade), and found that he exhibited only a couple of behaviors consistent with ADHD. She assessed his GAF as reflecting transient symptoms. See **Hudson ex rel. Jones v. Barnhart**, 345 F.3d 661, 667 (8th Cir. 2003) (finding it significant that examining consultant was the only witness to offer an opinion based on record as a whole, including claimant's medical records and educational records).

The domain of health and physical well-being requires a consideration of "the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on [the child's] functioning . . . ." 20 CF.R. § 416.926a(l). Examples of such effects include somatic complaints related to seizure activity or limitations in physical functioning because of nebulizer treatments. § 416.926a(l)(ii) and (iii). There is substantial evidence on the record as a whole to support the ALJ's conclusion that Plaintiff had less than a marked limitation in this area. Asthma did not prevent him from engaging in outdoor sports or in any other physical activities. There is no evidence that the staring spells that were sometimes described as seizures limited his functioning.

Plaintiff characterizes the ALJ's assessment of Plaintiff's functioning in the two cited domains as without substantial support because he did not explain his rationale for not relying on the assessment of Plaintiff's functioning by the nonexamining consultants that he had a marked limitation in the domain of health and physical well-being. The ALJ

did, however, set forth the evidence supporting his decision on the degree of limitation Plaintiff had in the functioning domains. "[T]he ALJ must consider the whole record." **Reeder v. Apfel**, 214 F.3d 984, 988 (8th Cir. 2000). The ALJ did. Moreover, as noted by the ALJ, a claimant must have a marked limitation in two domains to be disabled. Any deficiency in not explaining in more detail why he did not rely on the nonexamining consultants's opinion – an opinion issued without the benefit of all the medical records and reports that were before the ALJ – does not require that the ALJ's decision be set aside. See **Owen v. Astrue**, 551 F.3d 792, 801 (8th Cir. 2008) (arguable deficiencies in opinion-writing do not require that an administrative decision be set aside if those deficiencies had no bearing on the outcome); accord **Willcockson v. Astrue**, 540 F.3d 878, 880 (8th Cir. 2008); **Hepp v. Astrue**, 511 F.3d 798, 806 (8th Cir. 2008).

## Conclusion

For the foregoing reasons, the Court finds that there is substantial evidence in the record as a whole, including a consideration of the evidence that detracts from the ALJ's decision, to support the Commissioner's conclusion that Plaintiff is not disabled within the meaning of the Social Security Act. Accordingly,

**IT IS HEREBY RECOMMENDED** that the Commissioner's decision be AFFIRMED and the case be DISMISSED.

The parties are advised that they have **up to and including September 14, 2009**, by which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure

to file timely objections may result in waiver of the right to appeal questions of fact.  <u>See</u>

**<u>Griffini v. Mitchell</u>**, 31 F.3d 690, 692 (8th Cir. 1994).

<div style="margin-left:45%">
<u>/s/ Thomas C. Mummert, III              </u>
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE
</div>

Dated this <u> 2nd </u> day of September, 2009.